**PUBLIC DOCUMENT**

UNITED STATES COURT OF INTERNATIONAL TRADE

JSW STEEL (USA) INC.

        Plaintiff,

– against –

UNITED STATES,

        Defendant.

Court No. 19-00133

# PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR JUDGMENT ON THE AGENCY RECORD

Sanford Litvack
Andrew L. Poplinger
R. Matthew Burke
**CHAFFETZ LINDSEY LLP**
1700 Broadway, 33rd Floor
New York, NY 10019
Tel. (212) 257-6960
Fax. (212) 257-6950
s.litvack@chaffetzlindsey.com
a.poplinger@chaffetzlindsey.com
r.m.burke@chaffetzlindsey.com

*Counsel for Plaintiff JSW Steel (USA) Inc.*

# TABLE OF CONTENTS

Page

I.   PRELIMINARY STATEMENT ................................................................................ 1

II.  STATEMENT PURSUANT TO RULE 56.1 ........................................................... 4

   A.   Issue Presented For Review ............................................................................ 4

   B.   Administrative Determinations To Be Reviewed ............................................ 4

III. BACKGROUND ..................................................................................................... 5

   A.   Parties .............................................................................................................. 5

   B.   Statutory And Regulatory Background ............................................................ 6

   C.   JSW's Requests For Exclusion From Section 232 Tariffs ............................... 8

   D.   The Department's Boilerplate Denials Of JSW's Exclusion Requests.......... 11

IV.  ARGUMENT ........................................................................................................ 14

   A.   Applicable Legal Framework ........................................................................ 14

   B.   The Department's Denials Of JSW's Six Requests For Slabs With Thicknesses
      of 9.8-, 10-, and 12-Inches Run Counter To The Evidence And Must Be
      Reversed ........................................................................................................ 15

   C.   For All Twelve Requests, The Department Failed To Provide Any Reasoned
      Explanation For Its Conclusions .................................................................... 23

   D.   With Respect To All Twelve Requests, The Department Failed To Consider
      Important Aspects Of The Problem ................................................................ 27

     1.   The Failure To Consider Evidence Establishing That The Steel Slabs
        Were Not "Reasonably Available" In The United States In "Sufficient" Quantity....... 27

     2.   The Failure To Consider Evidence That The Objectors Could Not Produce
        Slab Of "Satisfactory Quality"................................................................. 30

     3.   The Failure To Consider Key Differences Among JSW's Slab Products..................... 32

     4.   The Failure To Verify US Steel's Incorrect Assertion That It Solicited Orders
        from JSW........................................................................................... 34

V.      CONCLUSION.................................................................................................................... 36

**PUBLIC DOCUMENT**

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*AT&T Wireless Servs., Inc. v. F.C.C.,*
 270 F.3d 959 (D.C. Cir. 2001)....................................................................................25, 34

*Butte County, Cal. v. Hogan,*
 613 F.3d 190 (D.C. Cir. 2010)................................................................................................33

*City of Kansas City, Mo. v. Dep't of Hous. & Urban Dev.,*
 923 F.2d 188 (D.C. Cir. 1991)....................................................................................15, 23

*Fred Meyer Stores, Inc. v. Nat'l Labor Relations Bd.,*
 865 F.3d 630 (D.C. Cir. 2017)................................................................................................27

*Judulang v. Holder,*
 565 U.S. 42 (2011)....................................................................................................................14

*United States v. Maverick Mktg., LLC,*
 322 F. Supp. 3d 1373 (Ct. Int'l Trade 2018) ........................................................................27

*Mizerak v. Adams,*
 682 F.2d 374 (2d Cir. 1982)....................................................................................................23

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
 463 U.S. 29 (1983)........................................................................................15, 24, 27

*Policy & Research, LLC v. United States Dep't of Health & Human Servs.,*
 313 F. Supp. 3d 62 (D.D.C. 2018) ........................................................................................20

*In re Sang Su Lee,*
 277 F.3d 1338 (Fed. Cir. 2002)....................................................................................15, 24

*Shinn Fu Co. of Am., Inc. v. Tire Hanger Corp.,*
 701 F. App'x 942 (Fed. Cir. 2017) ........................................................................................33

*Sierra Club v. EPA,*
 346 F.3d 955 (9th Cir. 2003) ..................................................................................................23

*SKF USA Inc. v. United States,*
 630 F.3d 1365 (Fed. Cir. 2011)..............................................................................................27

*Ultratec, Inc. v. CaptionCall, LLC,*
 872 F.3d 1267 (Fed. Cir. 2017)..............................................................................................26

*Water Quality Ins. Syndicate v. United States*,
  225 F. Supp. 3d 41 (D.D.C. 2016) .......................................................................30

*Way of Life Television Network, Inc. v. F.C.C.*,
  593 F.2d 1356 (D.C. Cir. 1979) ..........................................................................19

*Yale University v. U. S. Department of Commerce, Domestic & International
  Business Administration., Office of Import Programs*,
  579 F.2d 626 (C.C.P.A. 1977) .............................................................................26

**Statutes**

5 U.S.C. § 706 ..............................................................................................4, 14

19 U.S.C. § 1862 .................................................................................... *passim*

**Other Authorities**

15 C.F.R. pt. 705, supp. 1 ......................................................................... *passim*

Adjusting Imports of Steel into the United States, Pres. Proc. No. 9705, 83 Fed.
  Reg. 11,625 (Mar. 8, 2018) ..................................................................................6

Adjusting Imports of Steel into the United States, Pres. Proc. No. 9740, 83 Fed.
  Reg. 20,683 (Apr. 30, 2018) .................................................................................9

Submissions of Exclusion Requests and Objections to Submitted Requests for
  Steel and Aluminum, 83 Fed. Reg. 46,026 (Sept. 11, 2018) ........................... *passim*

PUBLIC DOCUMENT

Plaintiff JSW Steel (USA) Inc. ("JSW"), by its undersigned attorneys, Chaffetz Lindsey LLP, submits this Memorandum of Law in Support of its Motion for Judgment on the Agency Record, pursuant to CIT Rule 56.1.

## I.     PRELIMINARY STATEMENT

This case presents a textbook example of arbitrary and capricious agency action prohibited by the Administrative Procedure Act ("APA"), *See* 5 U.S.C. § 500 *et seq*.  What makes this case extraordinary is that the Department of Commerce ("Commerce" or the "Department") engaged in an unprecedented capitulation to three major American steel producers to deny twelve requests by JSW for the exclusion of steel slab imports from the Section 232 steel tariffs.  In doing so, the Department flouted its own rule, ignored the overwhelming and uncontroverted evidence before it, and became a rubber stamp for these domestic producers.  The history of the proceedings and the Department's fundamental failures tell an unfortunate story of a government agency disregarding basic notions of due process and fair play in order to reach an unsupportable, preordained conclusion.

The tale begins in March 2018, when Commerce, acting pursuant to a presidential directive, promulgated a rule designed to enable American steel producers to import steel products without having to incur the 25% tariff the President imposed on such products from a number of countries including (as pertinent here) India and Mexico.  Simply stated, the rule provides that companies can apply for an exclusion from the tariffs if the product sought to be imported is (a) not produced domestically in (b) sufficient and reasonably available quantity or satisfactory quality (c) to supply the requester "immediately" (defined as "within eight weeks").

In accordance with the published rule, JSW submitted twelve requests for exclusion from the tariffs for alloy and non-alloy steel slabs over 70 inches wide.  JSW needs these slabs to

**PUBLIC DOCUMENT**

manufacture specialized steel plate for use in heavy industry projects, such as oil and gas pipelines and shipbuilding.  The first six requests were for products imported from India with thicknesses of 8, 10, and 12 inches.  The next six were for 7.8-, 8.8-, and 9.8-inch thick slabs imported from Mexico.  JSW made these requests because these slabs, which are vital to its business, are not available in the United States.

In addition to providing a mechanism for companies to seek an exclusion from the tariffs, the Department's rule also permitted domestic producers to object to any requested exclusion *if* the domestic producer could satisfy the requester's requirements (both in terms of quantity and quality) for the product and do so within the specified eight-week time frame.  Taking advantage of that provision, three U.S. producers – U.S. Steel Corporation, A.K. Steel Corporation and Nucor Corporation (the "Objectors") – filed objections to every one of the more than 400 exclusion requests covering steel slab products, including every single one of JSW's requests.  They did so even though, as the record confirms, they knew that they could not supply the slabs in the sizes or quality JSW needs, let alone within the mandated eight weeks.

Despite the foregoing, with no investigation or analysis whatsoever, the Department issued twelve sweeping, conclusory, rulings denying every one of JSW's requests.  These denials were arbitrary and capricious and violated the APA because *inter alia* the Department:

- Ignored the uncontroverted evidence that none of the Objectors currently produces 9.8", 10" or 12" slabs, and could not do so within the requisite time;

- Ignored the uncontroverted evidence that the Objectors had no available capacity to supply 7.8", 8", or 8.8" slabs to JSW;

- Ignored the fact that none of the Objectors could meet JSW's quality requirements;

- Ignored the fact that the same companies had filed Objections to exclusion requests covering vastly greater quantities of steel slab than they could ever possibly produce; and

- Failed to set forth any rationale for its decisions, choosing instead to issue virtually identical boilerplate rulings devoid of any factual basis or reasoned analysis.

The Department's conduct is particularly problematic because it appears that the agency did not merely abdicate its responsibility to reach reasoned decisions on JSW's exclusion requests, but it *de facto* ceded the entire process to the Objectors, rotely denying every exclusion request for steel slab to which these companies objected. By doing so, the Department subverted its own process and ran roughshod over JSW's (and other requesters') rights.

The Department's management of the exclusion process is so troubling that, just over a month ago, the Department's Inspector General issued a rare warning to Commerce Secretary Wilbur Ross, expressing serious concern that irregularities in the process, including apparent undocumented, *ex parte* communications with objectors, "gives the appearance that Department officials may not be impartial or transparent and are potentially making decisions based on evidence not contained in the official record for specific exclusion requests." *See* "Management Alert: Certain Communications by Department Officials Suggest Improper Influence in the Section 232 Exclusion Request Review Process."[1]

Ignoring the record evidence and issuing decisions bereft of any analysis in order to favor one set of private interests over another is precisely the type of arbitrary and capricious agency action the APA protects against. This is true whether the Department's actions resulted from an extreme case of regulatory capture or its gravely mistaken reliance on the Objectors' unsupported representations. In either case, the Department's actions were blatantly arbitrary and they must be set aside. This is not a close call.

---

[1] A true and correct copy of the Inspector General's memorandum is attached as Exhibit C to the Declaration of R. Matthew Burke in Support of Plaintiff's Motion for Judgment on the Agency Record ("Burke Decl.").

**PUBLIC DOCUMENT**

## II.      STATEMENT PURSUANT TO RULE 56.1

### A.      Issue Presented For Review

Whether the decisions of the Department of Commerce denying JSW's twelve requests for exclusion from the Section 232 tariffs were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" in violation of the Administrative Procedure Act (5 U.S.C. § 706(2)(A)) due to the Department's failure to:  (i) properly consider and accept uncontroverted evidence in the record; (ii) adhere to its promulgated rule regarding the standard to be applied in considering exclusion requests; (iii) articulate a reasoned judgment connecting its conclusions to the evidence in the record; and (iv) reach conclusions based on the evidence in the record, rather than the unsupported claims of the self-interested Objectors.

We respectfully submit that the answer is "yes."

### B.      Administrative Determinations To Be Reviewed

JSW challenges twelve decisions by the Department denying JSW's requests for exclusions from the Section 232 tariffs for certain steel slabs.  Specifically, JSW challenges six determinations, dated April 19, 2019, denying exclusion requests for certain alloy and non-alloy steel slab imported from India.  These are Decision Nos.:

- BIS-2018-0006-1218 (8-inch non-alloy steel slab)[2]

- BIS-2018-0006-1221 (10-inch non-alloy steel slab)[3]

- BIS-2018-0006-1227 (12-inch non-alloy steel slab)[4]

- BIS-2018-0006-2335 (8-inch alloy steel slab)[5]

---

[2] Dkt. # 15-1 at 4-6.
[3] Dkt. # 15-2 at 4-6.
[4] Dkt. # 15-3 at 4-6.
[5] Dkt. # 15-4 at 4-5.

- BIS-2018-0006-2336 (10-inch alloy steel slab)[6]

- BIS-2018-0006-2337 (12-inch alloy steel slab)[7]

JSW also challenges six determinations, dated May 8, 2019, denying exclusion requests for certain alloy and non-alloy steel slab imported from Mexico.  These are Decision Nos.:

- BIS-2018-0006-29462 (7.8-inch non-alloy steel slab)[8]

- BIS-2018-0006-29465 (7.8-inch alloy steel slab)[9]

- BIS-2018-0006-29470 (8.8-inch non-alloy steel slab)[10]

- BIS-2018-0006-29474 (8.8-inch alloy steel slab)[11]

- BIS-2018-0006-29481 (9.8-inch non-alloy steel slab)[12]

- BIS-2018-0006-29484 (9.8-inch alloy steel slab)[13]

## III.    BACKGROUND

### A.    Parties

JSW is a major U.S. steel producer operating a plant in Baytown, Texas where it manufactures, among other things, steel plate for use in critical infrastructure projects in the United States.  In order to manufacture and supply that plate to its customers, JSW needs a reliable quantity of high quality steel slabs.  Since those slabs are not available in the United

---

[6] Dkt. # 15-5 at 4-5.

[7] Dkt. # 15-6 at 4-5.  Because JSW ultimately did not import any 12-inch alloy slab from India during the exclusion period, JSW did not pay any tariffs with respect to Request no. 2337.  However, because the Department gave the same treatment to this and the remaining eleven requests, JSW includes this request in its discussion of the Department's arbitrary and capricious conduct.

[8] Dkt. # 15-7 at 4-6.

[9] Dkt. # 15-8 at 4-5.

[10] Dkt. # 15-9 at 4-6.

[11] Dkt. # 15-10 at 4-5.

[12] Dkt. # 15-11 at 4-6.

[13] Dkt. # 15-12 at 4-5.

States, JSW submitted requests for exclusions from the Section 232 tariffs for those slabs, as set forth in detail below.

Defendant is the United States of America, acting by and through the U.S. Department of Commerce.  The Department wrongfully denied each and every request by JSW, leading to this action.

### B.        Statutory And Regulatory Background

In March 2018, the President, acting pursuant to Section 232 of the Trade Expansion Act of 1962 (19 U.S.C. § 1862), signed Proclamation 9705, which imposed a 25% tariff on steel imports.  The Proclamation, recognizing that these tariffs could have unintended consequences for U.S. businesses that rely on imports of steel products, directed the Secretary of Commerce to grant exclusions from the tariffs for any steel product that is "not produced in the United States in a sufficient and reasonably available amount or of a satisfactory quality."  Adjusting Imports of Steel into the United States, Pres. Proc. No. 9705, 83 Fed. Reg. 11,625, 11,627 (Mar. 8, 2018).

Later in March, the Department, acting through its Bureau of Industry and Security ("BIS"), issued an interim rule (codified at 15 C.F.R. pt. 705, supp. 1) setting forth the procedures for U.S. businesses to request an exclusion from the steel tariffs, and providing the standards the Department would apply in deciding whether to grant such a request.  Following a notice and comment period, on September 11, 2018 the Secretary issued an interim final rule supplementing the procedures and standards for deciding tariff exclusion requests.  *See* Submissions of Exclusion Requests and Objections to Submitted Requests for Steel and Aluminum, 83 Fed. Reg. 46,026 (Sept. 11, 2018) (the "Rule").  According to the Department, the Rule is intended to "fulfill the Presidential directives . . . to create an exclusion process to ensure users of steel . . . in the United States would continue to have access to steel and aluminum that

they may need." *Id.*

The Rule provides:

> The U.S. Department of Commerce will review each exclusion request to determine whether an article described in an exclusion request meets any of the following three criteria: the article is not produced in the United States in a sufficient and reasonably available amount, is not produced in the United States in a satisfactory quality, or for specific national security considerations.

15 C.F.R. pt. 705, supp. 1 § (c)(6).

The Rule also provides that domestic producers may object to an exclusion request by demonstrating that they can and will "immediately" ("within eight weeks"), supply the product or a suitable "substitute product" for which a tariff exclusion is sought in the quality and quantity required by the requester. *Id.* § (c)(6)(ii). A "substitute product" means an "equivalent" product meeting the "quality (e.g., industry specs or internal company quality controls or standards), regulatory, or testing standards, in order for the U.S. produced steel to be used in [the requester's] business activity in the United States by that end user." *Id.* § (c)(6)(ii).

The Department explained that "[a] credible objection must state that the objector can produce the product being sought." 83 Fed. Reg. 46,026, 46,035 (BIS Response to Comment (f)(4)(i)). The Rule plainly and sensibly placed the burden on an objector to demonstrate that it can produce the product or a suitable substitute within the requisite timeframe:

> The objection should clearly identify, and provide support for, its opposition to the proposed exclusion, with reference to the specific basis identified in, and the support provided for, the submitted exclusion request. If the objector is asserting that it is not currently producing the steel identified in an exclusion request but can produce the steel within eight weeks, the objector must identify how it will be able to produce the article within eight weeks.

*Id.* pt. 705, supp. 1 § (d)(4).

C.      JSW's Requests For Exclusion From Section 232 Tariffs[14]

JSW operates one of the widest plate mills in the United States in Baytown, Texas, where it produces cut-to-length steel plate greater than 150 inches wide.  JSW uses alloy and non-alloy steel slabs to manufacture the steel plate, which is used in critical infrastructure projects, such as natural gas and oil transmission pipelines, shipbuilding, transmission pole towers, wind towers, railroad tank cars, and other heavy equipment industries that require high quality steel plate and pipe products.[15]

To manufacture this plate, JSW requires a reliable feedstock of steel slabs that are more than 70 inches wide, with thicknesses between 7.8 inches and 12 inches.[16]  The thickness of the slab is critical to enable JSW to meet the metallurgical properties its customers require for their heavy industry applications.  In particular, as JSW informed the Department, it must satisfy certain "reduction ratios" in manufacturing the plate products to meet its customers' needs.[17]  For example, when a customer specifies a 4-inch plate with a 3:1 reduction ratio, JSW's process must start with a 12-inch thick slab.[18]  JSW must import these slabs, as it has done for years, if it is to continue manufacturing steel plate in Baytown because steel slabs of the thicknesses JSW requires are simply not available from U.S. producers.

---

[14] Unless otherwise indicated, all of the facts set forth herein were included in the administrative record. Citations to the relevant portion of the record for each request are indicated by reference to "Dkt. # 15-__ at [page number]." The pagination is the same for the Public Record (Dkt. #16).  For citations to the Pubic Record, see the corresponding page number for Docket # 16 (e.g., Dkt. # 16-__ at [page number]).

[15] Dkt. # 15-1 at 12; 16; Dkt. # 15-2 at 14, 21; Dkt. # 15-3 at 14, 21; Dkt. # 15-4 at 13, 20; Dkt. # 15-5 at 13, 20; Dkt. # 15-6 at 13, 20; Dkt. # 15-7 at 13, 20; Dkt. # 15-8 at 13, 20; Dkt. # 15-9 at 13, 20; Dkt. # 15-10 at 13, 20; Dkt. # 15-11 at 13, 20; Dkt. # 15-12 at 13, 20.

[16] Dkt. # 15-1 at 17; Dkt. # 15-2 at 22; Dkt. # 15-3 at 22; Dkt. # 15-4 at 21; Dkt. # 15-5 at 21; Dkt. # 15-6 at 21; Dkt. # 15-7 at 21; Dkt. # 15-8 at 21; Dkt. # 15-9 at 21; Dkt. # 15-10 at 21; Dkt. # 15-11 at 21; Dkt. # 15-12 at 21.

[17] Dkt. # 15-1 at 82; Dkt. # 15-2 at 92, 103; Dkt. # 15-3 at 92, 103; Dkt. # 15-4 at 75; Dkt. # 15-5 at 76; Dkt. # 15-6 at 76; Dkt. # 15-7 at 105; Dkt. # 15-8 at 105; Dkt. # 15-9 at 109; Dkt. # 15-10 at 109; Dkt. # 15-11 at 109; Dkt. # 15-12 at 109.

[18] See, e.g., Dkt. # 15-1 at 82; Dkt. # 15-2 at 89-90, 103.

**PUBLIC DOCUMENT**

Accordingly, on April 17, 2018, JSW filed six requests for exclusions from the Section 232 tariff for certain steel slabs imported from its parent company, JSW Steel Ltd., in India.  The six requests were limited to alloy and non-alloy steel slabs over 70 inches wide and produced to thicknesses of 8 inches (BIS-2018-0006-1218[19] and 2335[20]), 10 inches (BIS-2018-0006-1221[21] and 2336[22]), and 12 inches (BIS-2018-0006-1227[23] and 2337[24]).

Pursuant to Proclamation 9740, beginning June 1, 2018 the Section 232 tariffs also applied to steel imports from Mexico.  *See* Adjusting Imports of Steel into the United States, Pres. Proc. No. 9740, 83 Fed. Reg. 20,683, 20,685 (Apr. 30, 2018).  Therefore, on June 4, 2018, JSW filed six exclusion requests for steel slabs that it imports from ArcelorMittal Mexico to its Baytown facility.  The six requests were limited to alloy and non-alloy steel slabs over 70 inches wide and produced to thicknesses of 7.8 inches (BIS-2018-0006-29462[25] and 29465[26]), 8.8 inches (BIS-2018-0006-29470[27] and 29474[28]), and 9.8 inches (BIS-2018-0006-29481[29] and 29484[30]).

In support of these requests, JSW submitted detailed information and evidence regarding

---

[19] Dkt. # 15-1 at 11-32.

[20] Dkt. # 15-4 at 11-36.

[21] Dkt. # 15-2 at 12-37.

[22] Dkt. # 15-5 at 11-36.

[23] Dkt. # 15-3 at 12-37.

[24] Dkt. # 15-6 at 11-36.

[25] Dkt. # 15-7 at 11-35.

[26] Dkt. # 15-8 at 11-35.

[27] Dkt. # 15-9 at 11-35.

[28] Dkt. # 15-10 at 11-35.

[29] Dkt. # 15-11 at 11-35.

[30] Dkt. # 15-12 at 11-35.

the domestic market for these products, including statistics showing domestic steel capacity,[31] and metallurgical literature concerning the requisite manufacturing processes for JSW's high-grade products.[32]   These submissions provided uncontroverted evidence that, despite the Objectors' claims, JSW cannot source its steel slab feedstock in sufficient quantity or quality in the United States, because:

- The Objectors do not have the ability to produce any steel slabs with thicknesses of 9.8, 10, or 12 inches at all;

- The Objectors, while having the ability to produce some steel slabs with thicknesses of 7.8, 8, or 8.8 inches, do not have the capacity to produce and supply JSW with sufficient amounts of these slabs;[33]

- JSW does not use "commodity" grade slab products, and the Objectors are not capable of providing the high-grade slab JSW requires because, among other reasons, these producers lack the necessary reconditioning facilities;[34]

- Even assuming the Objectors were capable of ultimately meeting JSW's quality requirements, it would take at least 8-10 months of trial runs, testing and adjustments before JSW could source slab from these producers.[35]

Three companies, Nucor Corporation ("Nucor"), United States Steel Corporation ("U.S. Steel"), and AK Steel Corporation ("AK Steel") filed blanket objections to JSW's exclusion requests, just as they did in response to hundreds of other requests submitted by their domestic

---

[31] Dkt. # 15-1 at 28-32; Dkt. # 15-2 at 33-37; Dkt. # 15-3 at 33-37; Dkt. # 15-4 at 32-36; Dkt. # 15-5 at 32-36; Dkt. # 15-6 at 32-36; Dkt. # 15-7 at 31-35; Dkt. # 15-8 at 31-35; Dkt. # 15-9 at 31-35; Dkt. # 15-10 at 31-35; Dkt. # 15-11 at 31-35; Dkt. # 15-12 at 31-35.

[32] Dkt. # 15-1 at 83-85; Dkt. # 15-2 at 93-95; Dkt. # 15-3 at 104-106; Dkt. # 15-4 at 76-78; Dkt. # 15-5 at 77-79; Dkt. # 15-6 at 77-79; Dkt. # 15-7 at 106-108; Dkt. # 15-8 at 106-108; Dkt. # 15-9 at 110-112; Dkt. # 15-10 at 110-112; Dkt. # 15-11 at 110-112; Dkt. # 15-12 at 110-112.

[33] Dkt. # 15-1 at 16-18; Dkt. # 15-2 at 21-23; Dkt. # 15-3 at 21-23; Dkt. # 15-4 at 20-22; Dkt. # 15-5 at 20-22; Dkt. # 15-6 at 20-22; Dkt. # 15-7 at 20-22; Dkt. # 15-8 at 20-22; Dkt. # 15-9 at 20-22; Dkt. # 15-10 at 20-22; Dkt. # 15-11 at 20-22; Dkt. # 15-12 at 20-22.

[34] Dkt. # 15-1 at 18-19; Dkt. # 15-2 at 23-24; Dkt. # 15-3 at 23-24; Dkt. # 15-4 at 22-23; Dkt. # 15-5 at 22-23; Dkt. # 15-6 at 22-23; Dkt. # 15-7 at 22; Dkt. # 15-8 at 22; Dkt. # 15-9 at 22; Dkt. # 15-10 at 22; Dkt. # 15-11 at 22; Dkt. # 15-12 at 22.

[35] Dkt. # 15-1 at 18-19; Dkt. # 15-2 at 23-24; Dkt. # 15-3 at 23-24; Dkt. # 15-4 at 22-23; Dkt. # 15-5 at 22-23; Dkt. # 15-6 at 22-23; Dkt. # 15-7 at 22; Dkt. # 15-8 at 22; Dkt. # 15-9 at 22; Dkt. # 15-10 at 22; Dkt. # 15-11 at 22; Dkt. # 15-12 at 22.

competitors.[36]

AK Steel and U.S. Steel claimed, without support, that they could manufacture the slabs in the quality and quantity JSW needs within the timeframe required by the Rule.[37]   Nucor candidly admitted that it cannot produce any of the slabs for which JSW sought exclusions, but nonetheless claimed that it could produce a "substitute" downstream plate product that could replace, not the slabs in issue, but the product JSW manufactures from the slab it imports.[38] However, Nucor had to admit that, even then, it could not produce a sufficient amount of that so-called substitute nor could it produce it within the requisite eight-week timeframe.

Altogether, requesters, including JSW, submitted 414 exclusion requests covering slabs falling within HTSUS[39] Codes 7224900055 and 7207120050.[40]   U.S. Steel, Nucor, and AK Steel, individually or in combination, objected to every single one of the 414 slab exclusion requests.[41]  And the Department sustained every one of those objections.

### D.      The Department's Boilerplate Denials Of JSW's Exclusion Requests

Initially, it should be noted, that the Department's Rule provided it would decide each exclusion request within 106 days of submission.  *See id.* pt. 705, supp. 1(h)(3)(i).   In fact, however, the Department, in derogation of its Rule, took more than a year to deny JSW's exclusion requests.   Thus, by the time the Department ruled on JSW's exclusion requests, the company had already imported and paid tariffs on every entry for which it sought a tariff

---

[36] AK Steel only objected to nine of JSW's twelve requests.  It did not object to JSW's three requests concerning alloy steel slab from India (Request Nos. 2335, 2336 and 2337).

[37] Dkt. # 15-1 at 34, 56; Dkt. # 15-2 at 39, 67; Dkt. # 15-3 at 39, 67; Dkt. # 15-4 at 61; Dkt. # 15-5 at 61; Dkt. # 15-6 at 61; Dkt. # 15-7 at 37, 71; Dkt. # 15-8 at 37, 71; Dkt. # 15-9 at 37, 71; Dkt. # 15-10 at 37, 71; Dkt. # 15-11 at 37, 71; Dkt. # 15-12 at 37, 71.

[38] Dkt. # 15-1 at 37; Dkt. # 15-2 at 44; Dkt. # 15-3 at 44; Dkt. # 15-4 at 38; Dkt. # 15-5 at 38; Dkt. # 15-6 at 38; Dkt. # 15-7 at 42; Dkt. # 15-8 at 42; Dkt. # 15-9 at 42; Dkt. # 15-10 at 42; Dkt. # 15-11 at 42; Dkt. # 15-12 at 42.

[39] "HTSUS" refers to the Harmonized Tariff Schedule of the United States.

[40] *See* Burke Decl., Ex. A.

exclusion,[42] amounting to tens of millions of dollars, simply because the Department failed to adhere to its own Rule.

When it finally did act on JSW's requests over a year later, Commerce simply recited, verbatim, the same boilerplate language for each of the twelve requests, providing no reasoning whatsoever to support its conclusions. Instead, in each case, BIS merely stated that it was relying on the unpublished "recommendation" of another entity within the Department, the International Trade Administration ("ITA").[43] Thus, the rulings stated:

> In examining whether the relevant steel article is produced in the United States in a sufficient and reasonably available amount or of a satisfactory quality, ITA [International Trade Administration] recommends finding, based on all of the evidence presented, that the product referenced in the above-captioned exclusion request is produced in the United States in a sufficient and reasonably available amount and of a satisfactory quality, and recommends denying the request for an exclusion.
>
> BIS accepts ITA's recommended findings as to the domestic availability of the product . . . .[44]

The Department did not provide ITA's Recommendations to the requesters, and so until this lawsuit was filed, JSW did not even know what BIS was relying upon when it said, "BIS accepts ITA's recommended findings." When JSW finally saw the ITA's Recommendations, which were all virtually identical, it turned out that the ITA also did not provide any analysis or explanation for its conclusions. Rather, as explained in further detail below (Section IV.C, *infra*), the ITA merely gave an incomplete and generic regurgitation of some of the points

---

[41] *Id.*

[42] JSW sought exclusion requests for a period of one-year – the default period for exclusion under the Rule. *See, e.g.,* Dkt. # 15-1 at 11; *see also* 15 C.F.R. pt. 705 Supp. 1 § (h)(2)(iv).

[43] For the six requests concerning non-alloy slabs (Request nos. 1218, 1221, 1227, 29462, 29470, 29481), the Department also noted that JSW's HTSUS code designations appeared to be incorrect. This ministerial error, which JSW could easily correct, was irrelevant because the agency denied the requests on what it deemed to be the merits.

[44] Dkt. # 15-1 at 5; Dkt. # 15-2 at 5; Dkt. # 15-3 at 5; Dkt. # 15-4 at 5; Dkt. # 15-5 at 5; Dkt. # 15-6 at 5; Dkt. # 15-7 at 5; Dkt. # 15-8 at 5; Dkt. # 15-9 at 5; Dkt. # 15-10 at 5; Dkt. # 15-11 at 5; Dkt. # 15-12 at 5.

offered by JSW and the Objectors.  It did not distinguish among the specific slab products, and it did not even purport to analyze any of the evidence before it.  In fact, each ITA Recommendation[45] ended with the same conclusory statement that [

]46

The ITA's recommendations, which formed the basis of the Department's conclusions, are part of a disturbing pattern of the agency not fulfilling its mandate, but rather deferring to the large domestic companies that aggressively objected across the board to every request of JSW and others.  Indeed, the pattern that has emerged is so troubling that it has led the Office of the Inspector General to warn the Secretary of Commerce about improper influences in the process and the appearance of impropriety presented by the Department's conduct.  *See* "Management Alert: Certain Communications by Department Officials Suggest Improper Influence in the Section 232 Exclusion Request Review Process."[47]

The irregularities identified by the Inspector General included the Department's reconsideration of approved exclusion requests "at the request of an objector," and the Department's revision of a review criterion "within days of receiving a communication from an objector regarding the criterion."  *Id.*  The Inspector General also noted that Department officials had conducted undocumented, off-the-record *ex parte* communications with some objectors.  The Inspector General therefore expressed serious concern that the exclusion process lacked

---

[45] Tellingly, the ITA prepared only four Recommendation memoranda purporting to address JSW's twelve exclusion requests.  *See* Dkt. # 15-1 at 8 (Request No. 1218); Dkt. # 15-2 and Dkt. # 15-3 at 8 (Request Nos. 1221 and 1227); Dkt. # 15-4, Dkt. # 15-5, and Dkt. # 15-6 at 8 (Request Nos. 2335, 2336 and 2337); Dkt. # 15-7, Dkt. # 15-8, Dkt. # 15-9, Dkt. # 15-10, Dkt. # 15-11 and Dkt. # 15-12 at 8 (Request Nos. 29462, 29465, 29470, 29474, 29481, and 29484).

[46] Dkt. # 15-1 at 8-9; Dkt. # 15-2 at 8-9; Dkt. # 15-3 at 8-9; Dkt. # 15-4 at 8-9; Dkt. # 15-5 at 8-9; Dkt. # 15-6 at 8-9; Dkt. # 15-7 at 8-9; Dkt. # 15-8 at 8-9; Dkt. # 15-9 at 8-9; Dkt. # 15-10 at 8-9; Dkt. # 15-11 at 8-9; Dkt. # 15-12 at 8-9.

[47] Burke Decl., Ex. C.

transparency and impartiality.  As the Inspector General tactfully put it:

> *This gives the appearance that Department officials may not be impartial or transparent and are potentially making decisions based on evidence not contained in the official record for specific exclusion requests*.

*Id.* (emphasis added.)

More bluntly stated, the irregularities, when combined with the Department's summary, *pro forma* denials of all of the more than 400 exclusion requests for steel slab, support the conclusion that the Department did, unfortunately, cede its responsibility to the Objectors, rather than reaching reasoned decisions based on the actual record evidence regarding JSW's exclusion requests.   The Department's disregard of its obligation to engage in fair, reasoned decisionmaking mandates reversal of its rulings.

## IV.   ARGUMENT

### A.   Applicable Legal Framework

The standard for reviewing agency action under the APA is well known to this Court and need not be belabored here.  The Court will set aside a challenged agency action if it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  While "a court is not to substitute its judgment for that of the agency" when conducting such a review, "courts retain a role, and an important one, in ensuring that agencies have engaged in reasoned decisionmaking."  *Judulang v. Holder*, 565 U.S. 42, 53 (2011).  The Court "must assess . . . whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  *Id.* (quotations and citations omitted).  "That task involves examining the reasons for the agency decisions – or, as the case may be, the absence of such reasons."  *Id.*

The Supreme Court has instructed that agency action is arbitrary and capricious if:

> the agency has relied on factors which Congress has not intended it
> to consider, entirely failed to consider an important aspect of the
> problem, offered an explanation for its decision that runs counter
> to the evidence before the agency, or is so implausible that it could
> not be ascribed to a difference in view or the product of agency
> expertise.

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43

(1983).  "Agency action based on a factual premise that is flatly contradicted by the agency's

own record does not constitute reasoned administrative decisionmaking, and cannot survive

review under the arbitrary and capricious standard." *City of Kansas City, Mo. v. Dep't of Hous.*

*& Urban Dev.*, 923 F.2d 188, 194 (D.C. Cir. 1991).

Critically, in order for there to be meaningful judicial review, the agency must, in the first

instance, "not only have reached a sound decision, but have articulated the reasons for that

decision." *In re Sang Su Lee*, 277 F.3d 1338, 1342 (Fed. Cir. 2002).  In other words, the agency

"must examine the relevant data and articulate a satisfactory explanation for its action including

a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs.*

*Ass'n.*, 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168

(1962)).  The Department has woefully failed to do that here.

> **B.     The Department's Denials Of JSW's Six Requests For Slabs With**
> **Thicknesses of 9.8-, 10-, and 12-Inches Run Counter To The Evidence**
> **And Must Be Reversed**

The Department's decisions denying JSW's six requests concerning 9.8-, 10-, and 12-

inch alloy and non-alloy steel slabs (Request nos. 1221, 1227, 2336, 2337, 29481, 29484) are

arbitrary and capricious because the Department's conclusions that these products are

sufficiently and reasonably available in the United States are not only unfounded, they actually

"run[] counter to the evidence before the agency." *Motor Vehicle Mfrs. Ass'n.*, 463 U.S. at 43.

The only factual evidence in the record is that alloy and non-alloy steel slab with

thicknesses of 9.8-, 10-, and 12-inches are *not* produced in the United States in sufficient and reasonably available amounts to meet JSW's requirements.

JSW submitted uncontroverted evidence that ArcelorMittal is the *only* domestic producer that currently has the capability to produce slab with a thickness of 9.8 inches or greater. But ArcelorMittal consumes all of the slab it produces to feed its own plate and coil production at the same mills, and hence is not a source for JSW.[48] As JSW advised the Department, it is seeking an exception for the slab it imports from ArcelorMittal Mexico precisely because ArcelorMittal consumes all of the slab its produces in the United States, and will not supply slab to JSW from its U.S. facility.[49] Neither ArcelorMittal nor the Objectors have claimed otherwise. In fact, although it has objected to hundreds of exclusion requests for various steel products, ArcelorMittal did not object to any of JSW's exclusion requests.[50] Indeed, ArcelorMittal did not object to any of the 414 exclusion requests for alloy and non-alloy steel slabs.[51] It did not do so for a simple reason – ArcelorMittal recognizes that it is not a reasonably available domestic source for the slab products JSW imports.

As for the Objectors, the record establishes that they do not and cannot produce any steel slab with a thickness of 9.8 inches or greater at their existing, operational facilities. That is undisputed.

**AK Steel.** For its part, AK Steel made the naked claim, in a one-line statement, that it

---

[48] Dkt. # 15-1 at 17-18; Dkt. # 15-2 at 22-23; Dkt. # 15-3 at 22-23; Dkt. # 15-4 at 21-22; Dkt. # 15-5 at 21-22; Dkt. # 15-6 at 21-22; Dkt. # 15-7 at 21-22; Dkt. # 15-8 at 21-22; Dkt. # 15-9 at 21-22; Dkt. # 15-10 at 21-22; Dkt. # 15-11 at 21-22; Dkt. # 15-12 at 21-22.

[49] Dkt. # 15-7 at 22; Dkt. # 15-8 at 22; Dkt. # 15-9 at 22; Dkt. # 15-10 at 22; Dkt. # 15-11 at 22; Dkt. # 15-12 at 22.

[50] Dkt. # 15-2 at 89; Dkt. # 15-3 at 89.

[51] *See* Burke Decl., Ex. A.

has the ability and capacity to manufacture such slabs.[52]   But despite the requirements of the

Rule, AK Steel offered no facts to support its claim.  15 C.F.R. Part 705, supp. 1 § (d)(4).  That

is not surprising, however, because the published statistics from the 2018 Association of Iron and

Steel Technology (AIST) Directory of Iron and Steel Plants, which are part of the agency record,

establish that AK Steel does not have a single facility that is capable of casting slab thicker than

9.5 inches.[53]   What is surprising, and troubling, is that Commerce did not require any factual

support for AK Steel's claim, and ignored the conclusive evidence that, in fact, AK Steel cannot

produce slab in these thicknesses.

> **U.S. Steel.**   While objecting to every JSW exclusion request, U.S. Steel also did not

claim that it presently has the capability to cast slabs thicker than [     ] inches.[54]   The ITA

Recommendations, however, [



]{55}

The ITA's statement is mystifying because, while it talks about the volume of steel U.S.

Steel claims its can produce, it fails to mention the critical fact that none of that is steel slab of

9.8 inches or thicker, which is the focus of the exclusion requests.  In fact, U.S. Steel ***did not***

---

[52] Dkt. # 15-1 at 36 ("AK Steel objects because it has the ability and capacity to manufacture this product."); Dkt. # 15-2 at 43; Dkt. # 15-3 at 43; Dkt. # 15-7 at 41; Dkt. # 15-8 at 41; Dkt. # 15-9 at 41; Dkt. # 15-10 at 41; Dkt. # 15-11 at 41; Dkt. # 15-12 at 41.

[53] Dkt. # 15-1 at 29; Dkt. # 15-2 at 35,; Dkt. # 15-3 at 35; Dkt. # 15-4 at 34; Dkt. # 15-5 at 34; Dkt. # 15-6 at 34; Dkt. # 15-7 at 33; Dkt. # 15-8 at 31-32; Dkt. # 15-9 at 33; Dkt. # 15-10 at 33; Dkt. # 15-11 at 33; Dkt. # 15-12 at 33.

[54] *See, e.g.,* Dkt. #15-2 at 129 [                                                ].

[55] Dkt. # 15-1 at 8-9; Dkt. # 15-2 at 8-9; Dkt. # 15-3 at 8-9; Dkt. # 15-4 at 8-9; Dkt. # 15-5 at 8-9; Dkt. # 15-6 at 8-9; Dkt. # 15-7 at 8-9; Dkt. # 15-8 at 8-9; Dkt. # 15-9 at 8-9; Dkt. # 15-10 at 8-9; Dkt. # 15-11 at 8-9; Dkt. # 15-12 at 8-9.

*even claim* that it could produce slabs 9.8-inches or thicker at any of these facilities.  Instead, U.S. Steel suggested that it could *potentially* produce some unspecified amount of these slabs at only two of these facilities at some unspecified point in the future.  In particular, it claimed that it could *eventually* (a) produce 10-inch slab at its idle Fairfield, Alabama facility;[56] and (b) produce 12-inch slab by [

].[57]

U.S. Steel's submission is particularly noteworthy because it confirms what is undisputed in the agency record, namely that slabs with thicknesses of 9.8-inches or more are simply not available in the United States.  First, with respect to the purported 10-inch capacity at its idle Fairfield facility, U.S. Steel acknowledged in its submissions that this facility is "unfinished" and therefore can currently supply zero amount of steel slab.[58]  Obviously, until U.S. Steel actually completes construction and restarts its Fairfield facility, no amount of steel slab from this facility is "reasonably available."  Moreover, it is unclear when and if U.S. Steel will ever complete construction of the facility.  The company announced in February 2019, nearly a year after JSW submitted its requests, that it would restart construction of its electric arc furnace at its Fairfield plant, and predicted it would take over a year-and-a-half to complete.  *See* Press Release, U.S. Steel, United States Steel Announces Restart of Construction of Electric Arc Furnace (Feb. 11,

---

[56] Dkt. # 15-1 at 108; Dkt. # 15-2 at 129; Dkt. # 15-3 at 128; Dkt. # 15-4 at 101; Dkt. # 15-5 at 102; Dkt. # 15-6 at 101; Dkt. # 15-7 at 131; Dkt. # 15-8 at 131; Dkt. # 15-9 at 131; Dkt. # 15-10 at 131; Dkt. # 15-11 at 135; Dkt. # 15-12 at 135.  [                                                                                            ].

[57] Dkt. # 15-1 at 108; Dkt. # 15-2 at 129; Dkt. # 15-3 at 128; Dkt. # 15-4 at 101; Dkt. # 15-5 at 102; Dkt. # 15-6 at 101; Dkt. # 15-7 at 131; Dkt. # 15-8 at 131; Dkt. # 15-9 at 131; Dkt. # 15-10 at 131; Dkt. # 15-11 at 135; Dkt. # 15-12 at 135.  [

]

[58] Dkt. # 15-1 at 56; Dkt. 15-2 at 67; Dkt. # 15-3 at 67; Dkt. # 15-4 at 61; Dkt. # 15-5 at 61; Dkt. # 15-6 at 61; Dkt. # 15-7 at 69; Dkt. # 15-8 at 69; Dkt. # 15-9 at 69; Dkt. # 15-10 at 69; Dkt. # 15-11 at 69; Dkt. # 15-12 at 69.  Even if the facility were to become operational, U.S. Steel would still have to demonstrate the capability to supply the slab JSW imports in the amount and quality that JSW requires.  As described in Section IV.D.2, *infra*, JSW submitted

2019), https://www.ussteel.com/newsroom/united-states-steel-announces-restart-construction-electric-arc-furnace.[59] In other words, it is clear that U.S. Steel could not (and still cannot) produce any slab at this facility within the requisite eight-week timeframe. 15 C.F.R. Part 705, supp. 1 § (c)(6)(i).

U.S. Steel's claim that it could produce 12-inch slab by [

] fares no better. U.S. Steel admitted that, were it actually to

[                                        ], the process would take between [

].[60] In other words, even if U.S. Steel were actually committed to [

] (which it still has not done more than a year later), it could not provide the slab JSW needs and seeks to import within the time required by the Rule. *See Way of Life Television Network, Inc. v. F.C.C.*, 593 F.2d 1356, 1359 (D.C. Cir. 1979) ("It is a 'well-settled rule that an agency's failure to follow its own regulations is fatal to the deviant action.'" (citation omitted)); *Policy & Research, LLC v. United States Dep't of Health & Human Servs.*, 313 F. Supp. 3d 62, 83 (D.D.C. 2018), *appeal dismissed*, 2018 WL 6167378 (D.C. Cir. Oct. 29, 2018) ("Under the most elementary precepts of administrative law, an agency has no choice but to provide a reasoned explanation for its actions, and it cannot undertake to act in a manner that is contrary to its own regulations." (citations omitted)).

What is terribly disappointing and disturbing is that the Department ignored these

---

evidence that, at best, it would take 8-10 months to qualify any new slab caster to provide slab meeting its production standards.

[59] *See* Burke Decl., Ex. B.

[60] Dkt. # 15-1 at 108; Dkt. # 15-2 at 129; Dkt. # 15-3 at 128; Dkt. # 15-4 at 101; Dkt. # 15-5 at 102; Dkt. # 15-6 at 101; Dkt. # 15-7 at 131; Dkt. # 15-8 at 131; Dkt. # 15-9 at 131; Dkt. # 15-10 at 131; Dkt. # 15-11 at 135; Dkt. # 15-12 at 135. In connection with Request no. 1227, U.S. Steel submitted an additional confidential letter to the Department admitting that it would take [

                    ] *See, e.g.,* Dkt. # 15-3 at 75. Whether it would take [                        ], U.S. Steel was clear that it could not produce any 12-inch slab within 8 weeks.

obvious, uncontroverted facts and went on blithely to find that the slabs are "produced in the United States in sufficient and reasonably available amount," based upon absolutely nothing.

**Nucor.** Nucor never even contended that it produces or could produce any of the slab products for which JSW sought exclusions. That of course, begs the question, why then (other than to join AK Steel and U.S. Steel) did Nucor even bother to object? However, whatever its motivation, once it admitted it did not produce any of the slab in issue that should have ended the inquiry with respect to Nucor. But it did not.

Determined to object despite not producing any of the slab products or an equivalent for any of them, Nucor claimed it could produce a "substitute downstream" steel plate product.[61] Incredibly, determined to deny the exclusion requests, the ITA appears to have either fallen for this ruse or wittingly indulged it.

In its Recommendation covering JSW's exclusion requests for 10- and 12-inch non-alloy steel slab from India (Request Nos. 1221 and 1227), while noting that [

], the ITA stated, without any explanation at all, that it [

][62]  Although Nucor made this same argument in objecting to every one of JSW's requests, the ITA did not purport to make a similar finding with respect to JSW's remaining requests, including the four additional requests covering 9.8-, 10-, and 12-inch slab (Request Nos. 2336, 2337, 29481, 29484). Nevertheless, each ITA Recommendation [

---

[61] Dkt. # 15-1 at 37; Dkt. # 15-2 at 44; Dkt. # 15-3 at 44; Dkt. # 15-4 at 38; Dkt. # 15-5 at 38; Dkt. # 15-6 at 38; Dkt. # 15-7 at 42; Dkt. # 15-8 at 42; Dkt. # 15-9 at 42; Dkt. # 15-10 at 42; Dkt. # 15-11 at 42; Dkt. # 15-12 at 42.

[62] Dkt. # 15-2 at 9; Dkt. # 15-3 at 9.  JSW submitted conclusive evidence that Nucor's steel plate product is not a substitute for JSW's steel plate product, in any event; it is not the same grade or quality as JSW's downstream product. *See, e.g.,* Dkt. 15-3 at 99.  The Department's failure to even consider this evidence renders its decisions arbitrary and capricious. *See* Section IV.D.2, *infra.*

]<sup>63</sup>

The BIS Decision Memoranda do not indicate one way or the other whether the Department rested its denial of any particular request on Nucor's claim. However, to the extent one guesses (and all one can do is guess) that this may have been a basis for the Department's denials of any of JSW's requests, including those concerning 9.8-, 10-, or 12-inch slab, those decisions would be arbitrary and capricious because the record evidence could not support such a finding.

First, Nucor's alleged "substitute product" is, by Nucor's admission, not a substitute at all for the slab products for which JSW requested exclusions.[64] Therefore, the alleged availability of this "substitute" is totally irrelevant. The Rule clearly specifies that an exclusion is to be granted if the "***article described in the exclusion request***" is not produced in the United States in a sufficient and reasonably available amount. 15 C.F.R. Part 705, supp. 1 § (c)(6). While the product offered by an objector need not "be identical, . . . it does need to be ***equivalent*** [to the requested] product," not some other product. *Id.* § (c)(6)(ii).

> "Substitute product" . . . means that the steel being produced by an objector can meet "immediately" . . . the quality (e.g., industry specs or internal company quality controls or standards), regulatory, or testing standards, in order for the U.S. produced steel to be ***used in that business activity in the United States by that end user***.

*Id.* Nucor's so-called "substitute product" is not a substitute for the slab at all; it is an entirely distinct, downstream manufactured plate product. The "article described in [JSW's] exclusion

---

[63] Dkt. # 15-1 at 8; Dkt. # 15-2 at 8; Dkt. # 15-3 at 8; Dkt. # 15-4 at 8; Dkt. # 15-5 at 8; Dkt. # 15-6 at 8; Dkt. # 15-7 at 8; Dkt. # 15-8 at 8; Dkt. # 15-9 at 8; Dkt. # 15-10 at 8; Dkt. # 15-11 at 8; Dkt. # 15-12 at 8.

[64] *See, e.g.*, Dkt. # 15-2 at 46 ("Nucor can produce downstream products with the same specifications as those downstream products produced from JSW's imported slab.")

requests" is steel slab, not steel plate. And JSW's "specified business activity," for which it uses this steel slab, is the manufacture of steel plate at its Baytown facility. A replacement for the downstream plate product JSW produces is not the "equivalent" of the upstream slab feedstock for which JSW sought exclusions. It is therefore obviously not a "substitute product" under the Rule.

Moreover, even assuming *arguendo* that any finding by the Department that Nucor produced a "substitute product" were tenable, Nucor's so-called "substitute" would still not be "produced in the United States in a sufficient and reasonably available amount." 15 C.F.R. Part 705, supp. 1 § (c)(6)(i). This is not debatable. Nucor admitted, and the ITA noted, that its "substitute" product would not be available to JSW in the requisite amount or within the requisite eight-week timeframe the Department's Rule requires. Nucor stated it would take 84 days[65] (i.e., twelve weeks) to produce this "substitute" product. And even then, it could only meet 60% of the volume JSW requires.[66] Given this record, it is a total mystery how the ITA could have cited [                    ] as relevant to its rulings at all. Indeed, it strongly suggests the ITA never actually reviewed the evidence or weighed it against the Rule.

In light of the fact that none of the Objectors could supply 9.8-, 10- or 12-inch slabs – which is undisputed in the record – those slabs are "not produced in the United States in a sufficient and reasonably available amount." Yet Commerce found precisely the opposite. These decisions plainly run counter to the record evidence. They are therefore indefensible and totally inexplicable on the merits.

---

[65] Dkt. # 15-1 at 39; Dkt. # 15-2 at 48; Dkt. # 15-3 at 48; Dkt. # 15-4 at 42; Dkt. # 15-5 at 42; Dkt. # 15-6 at 42; Dkt. # 15-7 at 46; Dkt. # 15-8 at 46; Dkt. # 15-9 at 46; Dkt. # 15-10 at 46; Dkt. # 15-11 at 46; Dkt. # 15-12 at 46.

[66] Dkt. # 15-1 at 39; Dkt. # 15-2 at 48; Dkt. # 15-3 at 48; Dkt. # 15-4 at 42; Dkt. # 15-5 at 42; Dkt. # 15-6 at 42; Dkt. # 15-7 at 46; Dkt. # 15-8 at 46; Dkt. # 15-9 at 46; Dkt. # 15-10 at 46; Dkt. # 15-11 at 46; Dkt. # 15-12 at 46.

In sum, because Commerce's decisions denying JSW's exclusion requests for 9.8-, 10-, and 12-inch thick slabs are flatly contradicted by the undisputed record evidence, they are arbitrary, capricious, and unsustainable. *See City of Kansas City, Mo. v. Dep't of Hous. & Urban Dev.*, 923 F.2d 188, 194 (D.C. Cir. 1991) ("Agency action based on a factual premise that is flatly contradicted by the agency's own record does not constitute reasoned administrative decisionmaking, and cannot survive review under the arbitrary and capricious standard."); *Mizerak v. Adams*, 682 F.2d 374, 376 (2d Cir. 1982) ("[A]n agency decision is arbitrary and must be set aside when it rests on a crucial factual premise shown by the agency's records to be indisputably incorrect.").

Further, because the correct conclusion based upon the record is so obvious, on remand, the Court should instruct the Department to grant JSW's exclusion request nos. 1221, 1227, 2336, 2337, 29481, and 29484 without further delay. *See Sierra Club v. EPA*, 346 F.3d 955, 963 (9th Cir. 2003) (holding that where "the conclusions that must follow from [the record] are clear," remand fails to "serve a useful purpose," and the court should instruct the agency as to the appropriate action).

## C.   For All Twelve Requests, The Department Failed To Provide Any Reasoned Explanation For Its Conclusions

It is well-settled that "[f]or judicial review to be meaningfully achieved . . . the agency tribunal must present a full and reasoned explanation of its decision." *In re Sang Su Lee*, 277 F.3d 1338, 1344 (Fed. Cir. 2002). Therefore, to withstand scrutiny under the APA, the Department was required to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. As the Federal Circuit explained, "[c]onclusory

statements . . . do not fulfill the agency's obligation" of "reasoned decisionmaking." *In re Sang Su Lee*, 277 F.3d at 1344-1345.

In this case, as previously explained, the Department set forth its decision with respect to each of JSW's exclusion requests in twelve virtually identical BIS Decision Memoranda. Each Memorandum states that "ITA recommends finding, based on all of the evidence presented, that the product referenced in the above-captioned exclusion request is produced in the United States in a sufficient and reasonably available amount and of a satisfactory quality, and recommends denying the request for an exclusion."[67] But neither the BIS Decision Memoranda, nor the ITA Recommendations on which BIS purported to rely, provide any explanation for how or why the Department determined that the data and facts in the records supported their conclusions.

The ITA's Recommendations [                                                          [68]

] For example, the ITA never addressed or considered JSW's evidence showing that: (i) the Objectors do not have the capability to produce slab with a thickness of 9.8 inches or greater;[69] (ii) the Objectors lacked the required reconditioning facilities to meet JSW's

---

[67] Dkt. # 15-1 at 5; Dkt. # 15-2 at 5; Dkt. # 15-3 at 5; Dkt. # 15-4 at 5; Dkt. # 15-5 at 5; Dkt. # 15-6 at 5; Dkt. # 15-7 at 5; Dkt. # 15-8 at 5; Dkt. # 15-9 at 5; Dkt. # 15-10 at 5; Dkt. # 15-11 at 5; Dkt. # 15-12 at 5.

[68] ITA's Recommendations contain puzzling irregularities regarding AK Steel's objections. In three Recommendations, AK Steel is mentioned as objecting when AK Steel is not on the record as objecting. *See* Dkt. # 15-4 at 8; Dkt. # 15-5 at 8; Dkt. # 15-6 at 8. In one Recommendation, although AK Steel objected on the record, that objection is not cited in the Recommendation. Dkt. # 15-1 at 8–9, 34–36.

[69] Dkt. # 15-1 at 16-18; Dkt. # 15-2 at 21-23; Dkt. # 15-3 at 21-23; Dkt. # 15-4 at 20-22; Dkt. # 15-5 at 20-22; Dkt. # 15-6 at 20-22; Dkt. # 15-7 at 20-22; Dkt. # 15-8 at 20-22; Dkt. # 15-9 at 20-22; Dkt. # 15-10 at 20-22; Dkt. # 15-11 at 20-22; Dkt. # 15-12 at 20-22.

quality specifications;[70] (iii) it would take at least 8-10 months for the Objectors to establish a suitable production protocol to meet JSW's quality requirements for slab;[71] (iv) the Objectors would themselves consume any additional 7.8- to 8.8-inch thick slab they produced to feed their own coil-rolling operations;[72] and (v) the Objectors sought to block exclusion requests for vastly greater quantities of steel slab than they could ever provide.[73]

While the ITA identified [                                                      ][74] ITA did not "examine the relevant data" the parties' presented, and offered no "rational connection between the facts found and the choice made." *AT&T Wireless Servs., Inc. v. F.C.C.*, 270 F.3d 959, 968 (D.C. Cir. 2001) (finding agency decision arbitrary and capricious because the agency "fail[ed] to provide a reasoned justification" for its determination). Parroting the parties' claims without actually weighing the evidence is far short of the reasoned analysis the law requires. Commerce did not articulate the relationship between the facts and the conclusion reached, and for that reason alone its decisions must be reversed. *See Ultratec, Inc. v. CaptionCall, LLC*, 872 F.3d 1267, 1274 (Fed. Cir. 2017) (a court "cannot affirm agency decision-making where the agency fails to provide a reasoned basis for its decision").

---

[70] Dkt. # 15-1 at 18-19; Dkt. # 15-2 at 23-24; Dkt. # 15-3 at 23-24; Dkt. # 15-4 at 22-23; Dkt. # 15-5 at 22-23; Dkt. # 15-6 at 22-23; Dkt. # 15-7 at 22; Dkt. # 15-8 at 22; Dkt. # 15-9 at 22; Dkt. # 15-10 at 22; Dkt. # 15-11 at 22; Dkt. # 15-12 at 22.

[71] Dkt. # 15-1 at 18-19; Dkt. # 15-2 at 23-24; Dkt. # 15-3 at 23-24; Dkt. # 15-4 at 22-23; Dkt. # 15-5 at 22-23; Dkt. # 15-6 at 22-23; Dkt. # 15-7 at 22; Dkt. # 15-8 at 22; Dkt. # 15-9 at 22; Dkt. # 15-10 at 22; Dkt. # 15-11 at 22; Dkt. # 15-12 at 22.

[72] Dkt. # 15-1 at 16-18; Dkt. # 15-2 at 21-23; Dkt. # 15-3 at 21-23; Dkt. # 15-4 at 20-22; Dkt. # 15-5 at 20-22; Dkt. # 15-6 at 20-22; Dkt. # 15-7 at 20-22; Dkt. # 15-8 at 20-22; Dkt. # 15-9 at 20-22; Dkt. # 15-10 at 20-22; Dkt. # 15-11 at 20-22; Dkt. # 15-12 at 20-22.

[73] Dkt. # 15-1 at 81; Dkt. # 15-2 at 102; Dkt. # 15-3 at 102; Dkt. # 15-4 at 84; Dkt. # 15-5 at 75; Dkt. # 15-6 at 85; Dkt. # 15-7 at 114; Dkt. # 15-8 at 114; Dkt. # 15-9 at 118; Dkt. # 15-10 at 118; Dkt. # 15-11 at 118; Dkt. # 15-12 at 118.

[74] Dkt. # 15-1 at 8-9; Dkt. # 15-2 at 8-9; Dkt. # 15-3 at 8-9; Dkt. # 15-4 at 8-9; Dkt. # 15-5 at 8-9; Dkt. # 15-6 at 8-9; Dkt. # 15-7 at 8-9; Dkt. # 15-8 at 8-9; Dkt. # 15-9 at 8-9; Dkt. # 15-10 at 8-9; Dkt. # 15-11 at 8-9; Dkt. # 15-12 at 8-9.

But Commerce's failure goes beyond its nonfeasance.  Without analysis or explanation, the ITA based its recommended denial of every one of JSW's requests on the same *pro forma* conclusion  that  [

]75  First, an [          ] is hardly a standard upon which a serious conclusion that purports to be fair and reasoned can be based.  Nor does an [

] answer the key questions under the Proclamation and the Rule – whether the products were in fact "reasonably available" to JSW from U.S. suppliers and whether the U.S. suppliers' products were of "satisfactory quality" to meet JSW's specifications.

More fundamentally, this [          ] appears to have been nothing more than the Objectors' naked allegations.  Accordingly, the best that can be said about the ITA's Recommendations is that the ITA decided to adopt the Objectors' *ipse dixit* instead of analyzing and weighing the actual data the parties submitted to arrive at its conclusion.  That is not reasoned decisionmaking.  *A fortiori*, neither is BIS's wholesale adoption of ITA's fatally flawed Recommendations.  *See Yale University v. U. S. Department of Commerce, Domestic & International Business Administration., Office of Import Programs*, 579 F.2d 626, 633 (C.C.P.A. 1977)76 (reversing denial of tariff exemptions for educational equipment where the Department merely adopted wholesale the recommendations of a National Institute of Health committee which "themselves do not present any discussion of the evidence which supports the conclusory statements therein").

---

75 Dkt. # 15-1 at 8-9; Dkt. # 15-2 at 8-9; Dkt. # 15-3 at 8-9; Dkt. # 15-4 at 8-9; Dkt. # 15-5 at 8-9; Dkt. # 15-6 at 8-9; Dkt. # 15-7 at 8-9; Dkt. # 15-8 at 8-9; Dkt. # 15-9 at 8-9; Dkt. # 15-10 at 8-9; Dkt. # 15-11 at 8-9; Dkt. # 15-12 at 8-9.

76 Decisions of the Court of Customs and Patent Appeals are binding in the Federal Circuit.  *See United States v. Maverick Mktg., LLC*, 322 F. Supp. 3d 1373, 1379, n.13 (Ct. Int'l Trade 2018).

In sum, the Department's failure to provide any reasoned explanation for its conclusions, putting forth instead boilerplate, conclusory, denials of JSW's exclusion requests requires, at a minimum, reversal.

### D. With Respect To All Twelve Requests, The Department Failed To Consider Important Aspects Of The Problem

An agency acts arbitrarily and capriciously if it fails to "consider an important aspect of the problem" before it. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Accordingly, the Department had "an 'obligation' to address important factors raised" by requesters or objectors. *SKF USA Inc. v. United States*, 630 F.3d 1365, 1374 (Fed. Cir. 2011). This required the Department to "reasonably reflect upon the information contained in the record and grapple with contrary evidence." *Fred Meyer Stores, Inc. v. Nat'l Labor Relations Bd.*, 865 F.3d 630, 638 (D.C. Cir. 2017). The Department did anything but that in this case. In fact, the Department failed even to acknowledge, let alone consider, several critical issues bearing on JSW's exclusion requests.

#### 1. The Failure To Consider Evidence Establishing That The Steel Slabs Were Not "Reasonably Available" In The United States In "Sufficient" Quantity

The Department expressly recognized that to properly evaluate an exclusion request it would have to consider "any concerns [requesters] had about an objector overcommitting the steel or aluminum manufacturer's current or future capacity." 83 Fed. Reg. 46,026, 46,037 (Sept. 11, 2018) (Comment (f)(6)(iii)(A)). Thus, when queried about how it would "deal with multiple exclusion requests where each individual request might be fulfilled from U.S. domestic parties, but the total of such requests exceeds current U.S. capacity," BIS promised that "[t]he Department, including product experts from ITA, will be evaluating these factors as part of the review process when objections are received." According to the Department, "these types of

27

trends . . . should be taken into account for an efficient and effective exclusion process." 83 Fed. Reg. 46,026, 46,037 (Comment (f)(6)(iii)(C)).

Nevertheless, when it came to evaluating JSW's requests, the Department did nothing to assess the legitimacy of the Objectors' purported "undertakings." To the contrary, the Department totally ignored the evidence demonstrating that the Objectors could not possibly supply the volume of products to which they were committing. As a result, the Department cavalierly denied JSW's exclusion requests without any consideration of the evidence that the Objectors lacked the capacity to supply the requisite product. This is yet another failure requiring reversal.

The record evidence regarding the capacity issue is overwhelming. JSW submitted evidence demonstrating that the Objectors lack the capacity to supply the amount of steel slab for which JSW requested tariff exclusions because: (i) the Objectors have insufficient slab casting capacity to supply their own needs for slab to produce high-margin downstream plate and coil products; and (ii) the Objectors filed objections to hundreds of exclusion requests covering vastly greater quantities of steel slab than they could ever possibly produce.

JSW submitted statistics from the AIST regarding U.S. producers' slab casting capacity.[77] In addition to demonstrating that none of the Objectors could produce 9.8-inch slab or greater (*see* Section IV.B, *supra*), these statistics show that with respect to 7.8, 8-, and 8.8-inch slab, U.S. Steel and AK Steel have greater rolling capacity to produce downstream coil products than they have slab-casting capacity.[78] These companies therefore consume all of the

---

[77] Dkt. # 15-1 at 28-32; Dkt. # 15-2 at 33-37; Dkt. # 15-3 at 33-37; Dkt. # 15-4 at 32-36; Dkt. # 15-5 at 32-36; Dkt. # 15-6 at 32-36; Dkt. # 15-7 at 31-35; Dkt. # 15-8 at 31-35; Dkt. # 15-9 at 31-35; Dkt. # 15-10 at 31-35; Dkt. # 15-11 at 31-35; Dkt. # 15-12 at 31-35.

[78] Dkt. # 15-1 at 18, 77, 88; Dkt. # 15-2 at 23, 88, 98-99, 109; Dkt. # 15-3 at 23, 88, 98, 109; Dkt. # 15-4 at 22, 71, 81; Dkt. # 15-5 at 22, 71, 82; Dkt. # 15-6 at 22, 71, 82; Dkt. # 15-7 at 22, 94-95, 111; Dkt. # 15-8 at 22, 94-95, 111;

slab they produce for their own rolling operations, and thus are not a realistic source for JSW. As noted, Nucor has no capacity to produce any slabs thicker than 7.8 inches.

Further, JSW also showed that the three Objectors had filed objections to greater quantities of steel slab products than they had the capacity to produce, even assuming that they did not consume *any* of their own slab. The following chart, taken from the submissions in the record, shows that the Objectors claimed (through their objections) that they could supply more than twice the amount of their existing capacity, regardless of the specific slab dimensions.[79]

| (1,000 metric tons) | Objections to Slab Exclusion Requests | Caster Capacity Excluding Idle Mills |
|---|---|---|
| AK Steel | 26,292 | 11,050 |
| Nucor | 22,334 | 3,600 |
| US Steel | 36,807 | 20,580 |
| Total | 85,433 | 35,230 |

Considering the entire record, including purportedly confidential information U.S. Steel submitted with its sur-rebuttal, the picture is even starker. Based on the information contained in their submissions, AK Steel and U.S. Steel have, at most, a combined [     ] metric tons of unused slab capacity (regardless of specific dimensions).[80] Yet, in response to these companies' objections, the Department denied exclusion requests for 16.3 million metric tons of steel slab

---

Dkt. # 15-9 at 22, 94-95, 115; Dkt. # 15-10 at 22, 94-95, 115; Dkt. # 15-11 at 22, 94-95, 115; Dkt. # 15-12 at 22, 94-95, 115.

[79] Dkt. # 15-1 at 81; Dkt. # 15-2 at 102; Dkt. # 15-3 at 102; Dkt. # 15-4 at 84; Dkt. # 15-5 at 75; Dkt. # 15-6 at 85; Dkt. # 15-7 at 114; Dkt. # 15-8 at 114; Dkt. # 15-9 at 118; Dkt. # 15-10 at 118; Dkt. # 15-11 at 118; Dkt. # 15-12 at 118.

[80] In its objection, AK Steel asserted that it had 4.47 million metric tons in total production capacity, and that its plants were at 89% utilization, meaning it had 0.49 million metric tons of available capacity. *See, e.g.*, Dkt. # 15-2 at 39. In U.S. Steel's CBI submission attached to its sur-rebuttal, it asserted that it had [     ] million metric tons of raw steel capacity, and that it had [     ] million metric tons in raw steel production, i.e., [     ] million metric tons of available capacity. *See, e.g.*, Dkt. # 15-2 at 129. Nucor is not included in this calculation because, as noted, it admittedly does not make any of the products for which JSW sought exclusions.

claiming that this slab "is produced in the United States in a sufficient and reasonably available

amount."[81]  These facts show that conclusion was plainly incorrect.

In its zest to uphold the objections, the Department ignored and totally failed to address

these basic facts.   This is critical, especially considering that the Department expressly

recognized at the outset that it had to consider these facts if it were to reach a reasoned decision.

83 Fed. Reg. 46,026, 46,037 (Comment (f)(6)(iii)(C)).   The Department's failure to do so renders

its decisions arbitrary and capricious.  *See Water Quality Ins. Syndicate v. United States*, 225 F.

Supp. 3d 41, 69 (D.D.C. 2016) (finding agency decision arbitrary and capricious where "[t]he

decision . . . ignores critical context provided in the . . . record and amounts to cherry-picking of

evidence that, when considered as a whole, raises significant doubt about the ultimate conclusion

reached").

> **2.      The Failure To Consider Evidence That The Objectors Could
> Not Produce Slab Of "Satisfactory Quality"**

The Department's Rule is clear that a product is not available in the United States unless

domestic suppliers can produce a product meeting the same "industry specs or internal company

quality controls or standards."   15 C.F.R. pt. 705, supp. 1 § (c)(6)(ii).   In response to concerns

that domestic manufacturers may be able to manufacture a particular product, but not meet a

requester's technical specifications, the Department stated that as part of the exclusion process it

"will assess whether manufacturing capability can meet the technical parameters for the specific

article in question."  83 Fed. Reg. 46,026, 46,030 (BIS Response to Comment (b)(4)).

Despite its promise to determine whether an objector could meet the quality requirements

of a request for exclusion, the Department did no such thing.   Neither the BIS decisions, nor the

---

[81] This data is compiled from publicly available documents posted by the Department on Regulations.gov.  *See*
Burke Decl. ¶¶ 3–4; *see also id.* Ex. A.

ITA Recommendations on which they are based, even pay lip service to the issue.  They make no finding and cite no evidence that products of suitable quality are available in the U.S. within the eight-week period.   Nor could they have made such a finding because the overwhelming evidence demonstrates precisely the opposite.

Without listing all the evidence here (since Commerce never even considered the matter) we note that JSW pointed out that its slabs were used in large diameter steel welded pipe and had to meet very difficult specifications, such as those from the American Petroleum Institute (API). As JSW explained, not all slab casters are the same.  The Objectors' casters produce light-grade slab used to make coil.  They are not capable of producing the heavy-grade slab needed for JSW's plate rolling operations.   In addition, because the slab JSW requires is subject to transverse and longitudinal cracking, they generally must be "reconditioned" using specialized facilities, which the Objectors do not have.[82]  Given the limitations of the Objectors' facilities, it is unlikely that they could ever produce slabs meeting JSW's quality requirements.  At best, JSW could only rely on the Objectors' casters following extensive trials of every grade, which would take at least 8-10 months.[83]

---

[82] Dkt. # 15-1 at 18-19; Dkt. # 15-2 at 23-24; Dkt. # 15-3 at 23-24; Dkt. # 15-4 at 22-23; Dkt. # 15-5 at 22-23; Dkt. # 15-6 at 22-23; Dkt. # 15-7 at 22; Dkt. # 15-8 at 22; Dkt. # 15-9 at 22; Dkt. # 15-10 at 22; Dkt. # 15-11 at 22; Dkt. # 15-12 at 22.

[83] Dkt. # 15-1 at 18-19; Dkt. # 15-2 at 23-24; Dkt. # 15-3 at 23-24; Dkt. # 15-4 at 22-23; Dkt. # 15-5 at 22-23; Dkt. # 15-6 at 22-23; Dkt. # 15-7 at 22; Dkt. # 15-8 at 22; Dkt. # 15-9 at 22; Dkt. # 15-10 at 22; Dkt. # 15-11 at 22; Dkt. # 15-12 at 22.  In response to concerns that qualifying a new supplier "is a lengthy process, taking as long as three years," the Department explained that, "[if] a U.S. supplier objects to an exclusion request, the burden is on that supplier to demonstrate that the exclusion should be denied" because the product is available in the United States in satisfactory quality within the requisite timeframe.  83 Fed. Reg. 46,026, 46,029 (Comment (b)(1)).  Moreover, U.S. Steel, in its own purportedly confidential submissions, acknowledged that [
                                                    ] *See, e.g.,* Dkt. # 15-2 at 75 ([


          ).  Notably, the Department requested this information from U.S. Steel in an email dated July 29, 2018, which is strangely missing from the agency's record.  In addition, and inexplicably, the Department only requested

**PUBLIC DOCUMENT**

JSW's customers demand conformance to critical specifications because otherwise the end-product would be unsafe for use in natural gas pipelines and other infrastructure projects, or would not meet federally mandated requirements.  Thus, as the Department is aware, JSW's customers have no choice but to demand and JSW has no choice but to supply plates and pipes made from slabs that meet these requirements.  *See* 15 C.F.R. Part 705, supp. 1 § (c)(6)(ii); 83 Fed. Reg. 46026-01, 46028-29 (Comment (b)(1)-(2)).

Given the critical importance of these quality and availability issues, the Department's failure to consider and address them is inexplicable.  It is yet another failure rendering the Department's conclusions arbitrary and unsustainable.  *See Butte County, Cal. v. Hogan*, 613 F.3d 190, 194 (D.C. Cir. 2010) ("[A]n agency's refusal to consider evidence bearing on the issue before it constitutes arbitrary agency action within the meaning of § 706."); *Shinn Fu Co. of Am., Inc. v. Tire Hanger Corp.*, 701 F. App'x 942, 946 (Fed. Cir. 2017) (finding agency decision arbitrary and capricious where it failed "to address the arguments that the parties present[ed] to it").

### 3. The Failure To Consider Key Differences Among JSW's Slab Products

As set forth above, JSW's exclusion requests covered twelve different slab products, with six different thicknesses.  The Department, however, issued virtually identical, *pro forma* decisions that failed to recognize any distinction among the products for which JSW sought exclusions.  As detailed in Section IV.B, *supra*, the Objectors simply do not produce 9.8-, 10, or 12-inch slab in any quantity or quality.  Since that is beyond doubt, when denying JSW's exclusion requests for these products we can only guess that the Department considered the

---

this information in connection with three of the twelve requests.  *See* Dkt. # 15-1 at 64-65; Dkt. # 15-2 at 74-75; Dkt. # 15-3 at 74-75.

Objectors' thinner products of 7.8–8.8 inches, which is all the Objectors could possibly provide, the equivalent of slab products 9.8 inches and above.[84]   Yet, they are not, as JSW's uncontroverted evidence established.

JSW's evidence established that its requirements for larger-thickness products could not be met by thinner slabs.   As JSW explained to the Department, to meet its customers' requirements JSW must start its production process with thicker slab inputs.   That is essential to satisfy the necessary metallurgical properties, toughness, through thickness, and material soundness required to produce the high quality downstream plate.[85]   The Objectors did not dispute any of these facts.   Nor could they.

As a study JSW submitted from the International Symposium on Recent Developments in Plate Steels points out, "choosing the proper slab dimension is absolutely critical."[86]   This is because to produce its high-quality steel plate, JSW must meet certain "reduction ratios" – *i.e.*, the ratio of the initial slab thickness to the ultimate plate thickness.   For example, JSW explained the issue to the Department through, among others, the following illustration:

> Pressure Vessel & Shipbuilding (ABS) steel plate is required by the material specification to have a minimum 3:1 reduction ratio. We sell up to 4" thick plate in these grades.   It is not possible to produce 4" thick plate from an 8" thick slab and achieve a 3:1 reduction ratio.   As such, 10" and 12" thick slabs are required by the material specification in this case.[87]

---

[84] Of course, once again we are left to guess what the Department considered or how it reached that conclusion because its opinions are devoid of any explanation or analysis.

[85] Dkt. # 15-1 at 79, 82; Dkt. # 15-2 at 89-90, 92; Dkt. # 15-3 at 90, 100; Dkt. # 15-4 at 75; Dkt. # 15-5 at 73, 76, Dkt. # 15-6 at 73, 76; Dkt. # 15-7 at 101-102, 105; Dkt. # 15-8 at 101-102, 105; Dkt. # 15-9 at 96, 98, 105-106, 109; Dkt. # 15-10 at 96, 98, 105-106; Dkt. # 15-11 at 96, 98, 105-106; Dkt. # 15-12 at 96, 98, 205-106.

[86] Dkt. # 15-1 at 83-85; Dkt. # 15-2 at 93-95, 104-106; Dkt. # 15-3 at 93-95, 104-106; Dkt. # 15-4 at 76-78; Dkt. # 15-5 at 77-79; Dkt. # 15-6 at 77-79; Dkt. # 15-7 at 106-108; Dkt. # 15-8 at 106-108; Dkt. # 15-9 at 99-101, 110-112; Dkt. # 15-10 at 99-101, 110-112; Dkt. # 15-11 at 99-101, 110-112; Dkt. # 15-12 at 99-101, 110-112.

[87] *See, e.g.,* Dkt. # 15-2 at 92, 103; Dkt. # 15-9 at 98, 109.

But neither the BIS Decision Memoranda nor the ITA Recommendations even mention "reduction ratios," let alone analyze whether JSW could use thinner plate as a substitute for the imported steel slab for which it sought exclusions.

The Department's denials without considering the critical differences among the twelve products for which JSW requested exclusions demonstrates the arbitrary and capricious nature of its conclusions. *See AT&T Wireless Servs.*, 270 F.3d at 968 ("Conclusory explanations for matters involving a central factual dispute where there is considerable evidence in conflict do not suffice to meet the deferential standards of our review. Basic principles of administrative law require the agency to examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." (internal quotations omitted)).

> **4.      The Failure To Verify US Steel's Incorrect Assertion That It Solicited Orders from JSW**

In each of its Recommendations, ITA noted U.S. Steel's allegedly confidential, sur-rebuttal submission that [

]  Importantly, this cryptic statement in a footnote to U.S. Steel's confidential sur-rebuttal supplement does not actually contain any representation as to the particular steel products for which U.S. Steel claims to have [

***

PUBLIC DOCUMENT

]<sup>88</sup>

In fact, in response to U.S. Steel's initial, public allegation in its objection supplements,[89] JSW informed the Department that it was very interested in purchasing slab from U.S. Steel; indeed, it was JSW, not U.S. Steel, that "made inquiry in April 2018, requesting a quote from [U.S. Steel] to supply slab." Yet, as JSW further informed the Department, U.S. Steel did not reply to JSW's solicitation until after JSW submitted its exclusion requests, and therefore "it [was] impossible for [U.S. Steel] to qualify its product or begin supplying JSW within the next 8 to 10 months."[90]

At that point, JSW reasonably believed that U.S. Steel's claim that it was soliciting orders from the company was a dead issue. However, apparently it was not because U.S. Steel alleged, in its sur-reply, that it [

]<sup>91</sup> But this time, U.S. Steel labelled its claim "confidential" so JSW never saw it, and because Commerce opted not to advise JSW of it, the company had no opportunity to respond to the claim.

The first JSW even knew of this claim in U.S. Steel's sur-rebuttal or that Commerce thought it was relevant to its decision was after this lawsuit was filed, when Commerce finally unveiled the ITA's Recommendations. If the Department had advised JSW of U.S. Steel's claim, as one would have expected (and basic fairness would suggest), the Department would have learned that JSW's discussions with U.S. Steel established that U.S. Steel could *not* supply

---

[88] Dkt. # 15-1 at 108 (note 4); Dkt. # 15-2 at 129; Dkt. # 15-3 at 128; Dkt. # 15-4 at 101; Dkt. # 15-5 at 102; Dkt. # 15-6 at 101; Dkt. # 15-7 at 131; Dkt. # 15-8 at 131; Dkt. # 15-9 at 135; Dkt. # 15-10 at 135; Dkt. # 15-11 at 135; Dkt. # 15-12 at 135.

[89] Dkt. # 15-1 at 57; Dkt. # 15-2 at 68; Dkt. # 15-3 at 68; Dkt. # 15-4 at 62; Dkt. # 15-5 at 62; Dkt. # 15-6 at 62; Dkt. # 15-7 at 72; Dkt. # 15-8 at 72; Dkt. # 15-9 at 72; Dkt. # 15-10 at 72; Dkt. # 15-11 at 72; Dkt. # 15-12 at 72.

[90] *See, e.g.*, Dkt. # 15-1 at 89.

[91] *See, e.g.*, Dkt. # 15-1 at 108.

JSW with the necessary slab products.   In particular, during these discussions, U.S. Steel acknowledged that it could not produce any 10- or 12-inch slab, nor could it produce any size slab with the chemical compositions JSW required.[92]   In other words, U.S. Steel confirmed what JSW told the Department – U.S. Steel could not supply the quantity or quality of slabs for which JSW sought exclusions.

In short, the evidence is that JSW was [                    ] only because U.S. Steel could not supply the products, as was readily apparent to the Department from the parties' submissions. To the extent the Department relied upon U.S. Steel's "confidential" allegation, it was plainly arbitrary and capricious to do so without getting all the facts and giving JSW the opportunity to respond.   Unfortunately, Commerce's conduct here is consistent with the Inspector General's concerns that the Department's process lacked transparency and favored objectors.

## V.   CONCLUSION

To summarize briefly, the record in this case presents an extreme example of arbitrary and capricious agency action.   Paying no attention to the APA or due process, the Department engaged in a charade.   Having seemingly established a procedure to assess and permit tariff exclusions, it abandoned that procedure and simply became the vehicle to protect the narrow, competitive interests of a few domestic steel producers, to the detriment of other domestic companies like JSW, whom the exclusions were specifically intended to protect.   The fact that the Department denied 100% of the exclusion requests for steel slab after hearing from the

---

[92] Between May 31 and June 7, 2019, JSW and U.S. Steel discussed U.S. Steel's proposal to provide slab to JSW. In the course of these discussions, JSW concluded that it was "obvious that US [Steel] is unable to supply our needs and JSW cannot wait any longer for a slab supplier."  Declaration of Rick Linkimer ¶ 6 & Ex. A.  The next day, U.S. Steel replied:  "It is unfortunate that it was not made clear that JSW was ONLY interested in 12" and 10" slabs."  *Id.* In other words, U.S. Steel confirmed exactly what JSW told the Department – U.S. Steel cannot supply these slabs. *See* Section IV.B, *supra.*  This evidence demonstrates what the Department would have discovered had they taken

Objectors, speaks volumes.   The Inspector General's warning about the irregularities and apparent bias in the process unfortunately was either too late or simply ignored by the Department.  Whichever is the case, the Department's actions cannot be accepted or condoned.

We therefore respectfully request that the Court set aside the Department's decisions denying JSW's exclusion requests, and instruct the Department to:

    (a) Grant JSW's requests for tariff exclusions for 9.8-, 10-, and 12-inch slab (Request Nos. BIS-2018-0006-1221, 1227, 2336, 2337, 29481, 29484), as required by the clear and uncontroverted record evidence that these products are not available in the United States in a sufficient and reasonably available amount or of a satisfactory quality;

    (b) Alternatively, issue a reasoned decision regarding JSW's requests for tariff exclusions for 9.8-, 10-, and 12-inch slab (Request Nos. BIS-2018-0006-1221, 1227, 2336, 29481, 29484), including articulating a rational basis for the conclusion the Department reaches based on the evidence in the record;

    (c) Issue a reasoned decision regarding JSW's exclusion requests for 7.8-, 8-, and 8.8-inch slabs (Request Nos. BIS-2018-0006-1218, 2335, 29462, 29465, 29470, 29474), including articulating a rational basis for the conclusion the Department reaches based on the evidence in the record;

    (d) Cease undocumented *ex parte* communications with objectors, and for any request remanded for further consideration, permit JSW an opportunity to respond to any *ex parte* communications the Department may have considered before rendering further decision on remand.

---

any steps to investigate and assess U.S. Steel's secret, sur-rebuttal claim that it [
    ] *See, e.g.,* Dkt. # 15-1 at 108.

**PUBLIC DOCUMENT**

Dated: New York, New York
December 13, 2019

Respectfully submitted:

**CHAFFETZ LINDSEY LLP**

By:____/s/ Sanford Litvack_____

Sanford Litvack
Andrew L. Poplinger
R. Matthew Burke
1700 Broadway, 33rd Floor
New York, NY 10019
Tel. (212) 257-6960
Fax. (212) 257-6950
s.litvack@chaffetzlindsey.com
a.poplinger@chaffetzlindsey.com
r.m.burke@chaffetzlindsey.com

*Counsel for Plaintiff JSW Steel (USA) Inc.*

**PUBLIC DOCUMENT**

## CERTIFICATE OF COMPLIANCE

Pursuant to Chambers Procedure 2(B)(1), the undersigned certifies that Plaintiff's Memorandum of Law in Support of Its Motion for Judgment on the Agency Record, filed on December 13, 2019, complies with the word limitation requirement.  The word count for Plaintiff's Memorandum of Law, as computed by Chaffetz Lindsey LLP's word processing system, is 10,112.

/s/ Sanford Litvack
Sanford Litvack
